McATEER v. McATEER.

1. Where a note was given for a sum certain, secured by a mortgage, but
   both parties concur that no money passed, and that the papers were
   executed for purposes other than what appeared on their face, parol
   testimony is admissible to show the real agreement of the parties; and
   in such case there is no presumption that the papers express the truth.
2. Where there is a conflict between referee and Circuit Judge in their
   findings of fact, the Circuit Judge is *prima facie* right. In this case,

the findings of the Circuit Judge, being supported by testimony, are sustained.

Before Hudson, J., Lancaster, October, 1888.

This was an appeal by plaintiff from the following decree :

This cause came on to be heard upon the report of the referee, M. J. Hough, Esq., and exceptions thereto. The referee finds that there is due upon the mortgage debt the sum of sixteen hundred and ninety-three dollars and forty-six cents. The case was fully argued upon the testimony, the report, and the exceptions, and I have since reviewed the testimony and given to the whole case close consideration. The testimony is very voluminous ; containing a great deal which I regard irrelevant. It is not without hesitation that I differ from the referee in his view of the facts. The opinion of one who is so good a lawyer and so careful and conscientious, carries with it great weight. It is manifest that he has, however, reached his conclusions with hesitation and without entire satisfaction to himself.

The fundamental question is, what was the real consideration of the mortgage debt, and not what should the plaintiff in equity recover of his mother upon a fair settlement between them. For what did the mother in 1879 give to her son, who was living with her, the note calling for one thousand dollars, and to secure which she gave a mortgage on her home place ? The referee finds that a part of the consideration was for services he had rendered his mother in managing her farm from 1874 to 1879.

The weight of the testimony will not sustain this conclusion. Outside of the plaintiff's statement there is no evidence that he worked for wages, nor that she has agreed to pay him for services. On the contrary, it appears that he, being the eldest son, managed and controlled the place, and derived from the crops a greater benefit than his mother and all the other children. So much so, that when in 1879 a settlement of the estate of his deceased father was had in the office of Mr. Moore, he receipted to his mother for his share thereof, and was told by the others at the time that he had been better paid than any of them. The object of the settlement was to ascertain the shares of the several dis-

tributees, and the amount due to each one by the mother, who was administratrix. No claim was made by the plaintiff for wages in managing the farm, and he receipted to his mother for his share.

On the same day, and after the ascertainment of the share due to each distributee, adult and minor, this note and mortgage were given by the mother to the son, not for any debt due by her to him at all, because there is no evidence of any existing debt, and no reason why there should have been any. On the contrary, he had for five years entire control and free use of the crops on the place, outside of what was consumed in support of the family, and a strict settlement would in all probability have shown that he was in debt to his mother, even had he charged annual wages for his services.

A careful scrutiny of the plaintiff's own testimony convinces me that his services in the management of the farm constituted no part of the consideration of the note. I am satisfied that the version of the transaction given by the mother and other witnesses is correct. Her only means of paying off the other distributees was from the products of the farm, and she was liable on a large security debt besides. Her eldest son, the plaintiff, was her only manager, and expected so to continue. He and his mother and some younger member of the family were living together in harmony and laboring together on the farm. To save this was their chief desire. . Should the Adams·debt be reduced to judgment, the patrimony would be endangered, and there would be nothing realized by the younger children. The expedient was resorted to of covering the place by a mortgage to the plaintiff, who took upon himself to pay off several of these shares, amounting to about $460, and the amount of the mortgage debt was enlarged to one thousand dollars for prudential reasons.

I can find no other element entering into the consideration of this mortgage. For eight years longer the plaintiff lived with his mother just as before, and had the free use of all crops made on the place, except what was consumed by the family, and what was expended in repairs and improvements. Making due allowance for all this, there still remains to him the lion's share, so to speak. Yet one of these shares of the distributees has never been

paid, whilst one was paid from cotton made on another place belonging to the mother, and not one has been paid except by the proceeds of crops of the mother's land.

Out of any funds fairly and properly belonging to the plaintiff, he has paid nothing. The Adams debt was paid by the sale of a separate tract of the mother's land, except a small balance paid by compromise out of crops made on the home place. The fact is, that for nearly fourteen years the entire fruits of the home place have been enjoyed by the plaintiff, except what went to the maintenance of the mother and younger children, all of whom helped to keep up the household and the farm, and except the repairs and improvements. For the plaintiff's share of the labor he has been handsomely compensated in having a comfortable home, a good living, and the surplus cash.

I can see no reason in law or equity why he should now enforce this mortgage and turn his aged mother out of house and home, and render her and one child penniless. The consideration of the mortgage has failed, or it has been fulfilled and discharged. Nothing is due. It is therefore ordered, adjudged, and decreed, that the defendant's exceptions to the report of the referee be sustained, that the findings and conclusions of the referee be overruled, and that the complaint be dismissed with cost.

*Messrs. R. E. & R. B. Allison* and *J. K. Henry,* for appellant.

*Mr. Ira B. Jones,* contra.

July 12, 1889. The opinion of the court was delivered by

Mr. Justice McGowan. Many years ago, the time not clearly stated, J. J. McAteer died intestate, leaving a widow, Martha E., the defendant, and four children, viz., Amelia (afterwards married to one Jennings), John, Mary Jane, and Andrew J., the plaintiff. It seems that the mother, Martha E., owned two tracts of land, the "Thompson tract" and the "home place," where the widow and her children lived together; that the mother owed some few debts, and among them, small balances still due to each of her children upon their shares of their father's estate in her

hands as administratrix, besides a larger debt which she owed as surety, spoken of as the Adams debt, to secure which she had mortgaged the "Thompson place."

About the year 1874, the youngest son, A. J. McAteer, the plaintiff, undertook to look after his mother's business, to run the farms, and to do the outdoor work for her, and as he was not married, he lived with his mother and sisters as one family—they cooking, washing, and helping what they could in the farm, and he overseeing all and getting to his own use all the surplus that was made, without accountability. Matters went on in this way until the elder children, Amelia and John, came of age, left the family, and wished the balance of their shares in their father's estate. On January 27, 1879, all the parties went to Lancaster Court House, and, in Mr. Moore's office, had a settlement. It appeared that the defendant, as administratrix, owed John $50, Amelia $205, and Mary Jane $205, making $460, for the payment of which amounts Andrew J. became surety for his mother. Andrew was also entitled to $205, but he acknowledged that it had been paid him in property, and on that day receipted in full for his share of his father's estate.

After this settlement had been made, but on the evening of the same day, the plaintiff and defendant, mother and son, went to another lawyer's office, and the mother signed a note to her son for the round sum of $1,000, and secured it by a mortgage of her only remaining tract of land, the "home place." The parties still continued to live together as one family, that is to say, the mother, Mary Jane, and the plaintiff, the latter having control and getting what was made after paying the debts and supporting the family until Andrew J. married, when he instituted this proceeding in 1887, to foreclose against his mother the mortgage which she had executed at Lancaster in January, 1879. The action was for foreclosure on the note pure and simple. It is true that in her answer the defendant, after denying the consideration of the note, went on to demand an account for the rents and profits of the home place for a number of years, and of the Thompson tract for the years 1879, 1880, and 1881, before it was sold to pay the Adams debt; and the plaintiff replied as if he were the owner of the whole establishment, by setting up a

very large amount, covering a period of eleven years, against his mother for board, lodging, clothing, shoes, medical account, repairs, taxes, &c., &c. But these charges and counter-charges are outside of the case, which was only for foreclosure of the mortgage, and to that the inquiry must be limited.

The plaintiff and defendant both concur that no money was paid or consideration given at the time the note and mortgage were signed; but that they were executed for purposes other than what appeared on the face of the papers. The parties respectively were allowed to testify as to what these purposes were. The mother testified that the only purpose was to save harmless and indemnify Andrew for whatever sums he, as her surety, might have to pay to Amelia, John, and Mary Jane ($460), and, as she said, "It was put $1,000, at Andy's request, to prevent the Adams debt reaching out and seizing the home place." And she declares that the contingent liabilities referred to were never incurred by Andrew, as he never paid anything of his own money on the debts for which he was surety; and therefore the consideration had utterly failed, or, in other words, the contingency on which the mortgage was to be binding never arose, of which Andrew was so conscious that when requested to give up the note and mortgage, he always replied, "It will never come against you." While, on the other hand, Andrew says that the mortgage was not only intended to indemnify him against what was due to Amelia, John, and Mary Jane, but covered his own claim against his mother for $205, making the actual consideration $665; and in respect to the remainder, in the words of his reply (after amendment): "Plaintiff had paid large sums of money for defendant to remove mortgage and judgment on the land, and he assumed other debts and liabilities for her, lawyer's fees, and other things"—claiming that he had paid John and Amelia with his own money; that he had paid Mary Jane by board at the common table, and that he had incurred all the liabilities which the mortgage was intended to indemnify him against.

It was referred to M. J. Hough, Esq., as special referee, to take the testimony, determine the issues, and to report thereon. He took a small volume of testimony, and, after careful consider-

ation and with some hesitation, he sustained the note and mortgage, and recommended foreclosure—holding, among other things, as follows : "On that day (January 27, 1879), defendant gave the note and mortgage in consideration that plaintiff would pay Amelia Jennings $205.37, John McAteer $50, and Mary Jane McAteer $205.37, making $460, and the consideration of the balance of note and mortgage was past services due him, and that he was to assume and pay off whatever other indebtedness of his mother should then be outstanding," &c.   Both parties excepted to this report, and, after argument, Judge Hudson overruled the report and dismissed the complaint, saying : "A careful scrutiny of the plaintiff's own testimony convinces me that his services in the management of the farm constituted no part of the consideration of the note.   I am satisfied that the version of the transaction given by the mother and other witnesses is correct.   Her only means of paying off the other distributees was from the products of the farm, and she was liable on a large security debt besides.   Her eldest [youngest] son was her only manager, and expected so to continue.   He and his mother and some younger members of the family were living together in harmony, and laboring together on the farm. * * *   For eight years longer (after the mortgage), the plaintiff lived with his mother just as before, and had the free use of all crops made on the place, except what was consumed by the family, and what was expended in repairs and improvements.   Making allowance for all this, there still remains to him the lion's share, so to speak," &c.

From this decree the plaintiff appeals to this court.   The exceptions are long and numerous (19 in number), and they are all in the Brief, and need not be again set out here.

The first exception makes a point of law, "that the Circuit Judge erred in allowing and using the parol testimony, which was taken down by the referee, after objection made, to contradict the note and mortgage given by the defendant."   It does not seem to us that this was a case in which parol evidence was offered to vary the terms of a written instrument.   It appeared that no money passed at the time the note and mortgage were given. These papers were in the usual form, and contained no indication of the object or purposes for which they were given.   It was,

therefore, necessary to resort to parol proof to ascertain the agreement of the parties. We are not called upon to give construction to the note and mortgage, but to determine from the evidence in what way and for what purpose they were to be used. The precise point was ruled in a case very much like this—*Kaphan* v. *Ryan*, 16 S. C., 352 : "Parol testimony may be received to prove an agreement, in which a written instrument originated, and of which it constituted only a part. Thus, where a note was given for a sum certain, payable at a day certain, secured by a mortgage, but no money passed, and it is admitted by both parties that these instruments were a security for future advances, it may be shown by parol what the agreement was, and what the bond and mortgage were intended to secure," &c. See *McCaughrin & Co.* v. *Williams*, 15 S. C., 505 ; *Calvert* v. *Nickles*, 26 S. C., 304 ; *Fullwood* v. *Blanding*, *Ibid.*, 312 ; 1 *Jones on Mortgages*, §§ 64, 384, 612 ; 2 *Ibid.*, § 1297, and notes.

All the other exceptions, in one form or another, complain of the findings of fact by the Circuit Judge, overruling the referee. The rule of this court upon that subject is well known. Being a case in chancery, we have the right to consider all the testimony. There is conflict in it, and in that case the judgment of the Circuit Judge is *prima facie* right. See *Maner* v. *Wilson*, 16 S. C., 481. In this connection, also, it was strongly insisted that the existence itself of the written note and mortgage raised a presumption of fact, that the $1,000 referred to was due and owing at the time in manner and form as stated, and consequently the *onus* was on the defendant to overthrow that presumption. We think that such papers duly executed would ordinarily afford at least *prima facie* evidence of the truth of the statements contained in them. But such rule cannot apply, where, by common consent, the papers do not express the whole agreement of the parties, or the real state of the facts, but were executed in form solely for the purpose of securing the party against future contingent or doubtful liabilities. In such case, there is no presumption, and the facts underlying the papers, like other facts, must be proved.

The Circuit Judge concurred with the referee in most of his findings. He concurred with him, that plaintiff's express liability

for his mother, which went into the consideration of the mortgage, did not exceed the amounts due to Amelia, John, and Mary Jane, viz., $460, and that the amount due Mary Jane was never paid by "boarding" or otherwise. But as to the remainder of the consideration, viz., $540, the referee found that it was "for past services due him," and that he was to assume and pay "other debts" of his mother, vaguely stated without names, dates, or amounts. In this finding the Circuit Judge did not concur, holding that it was not supported by the weight of the evidence. We have read the mass of testimony carefully, and found it so confused and conflicting, that we are not surprised that there should be different views as to its proper force and effect; but after giving it all the consideration we could, we cannot say that the finding of the Circuit Judge was erroneous.

From 1874 to 1879, her daughters and son, Andrew, lived with Mrs. McAteer on the old homestead as one family, Andrew superintending the farm and receiving the proceeds of crops, and his mother and sisters cooking, washing, and doing what they could to keep up the common establishment. No strict accountability was exacted of Andrew, and there was not any agreement or expectation that he was to be paid regular wages as an overseer. That, as it strikes us, was an after-thought. (1) The plaintiff, in his reply to the answer of the defendant, wherein he undertook to give an account of the mortgage and its consideration, did not claim that his "past services" entered into it. (2) On the morning of the day on which the mortgage was executed, the plaintiff receipted to his mother for his share of his father's estate, without saying anything about a claim "for services." It seems to us that if he held such a *bona fide* claim, he would at least have mentioned it on that occasion. (3) The referee, in another part of his report, states (as we think, correctly) "that his services were to stand against rent, everything included, taking care of family," &c. It does appear, with reasonable certainty, that the plaintiff was an active successful farmer, and, the wants of the family being few and simple, he made the farm profitable. In that he was enabled to assist his aged mother and her unmarried daughter, and to that extent he certainly deserves credit; but we cannot take the view, that in addition to his comfortable support

22—31

thus secured, and in addition to the whole surplus crops and rents, he should also be allowed now, after the lapse of years, to raise a lumping charge for services, sufficient to absorb the estate itself, leaving his mother and unmarried sister penniless and homeless.

The judgment of this court is, that the judgment of the Circuit Court be affirmed.